# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CITY PENSION FUND FOR
FIREFIGHTERS AND POLICE
OFFICERS IN THE CITY OF MIAMI,
on behalf of itself and all others
similarly situated,

Plaintiff,

v.

THE TRADE DESK, INC., LISE J.
BUYER, KATHRYN E. FALBERG,
THOMAS FALK, JEFF GREEN, ERIC
B. PALEY, DAVID R. PICKLES,
BLAKE GRAYSON, GOKUL
RAJARAM, BRIAN J. STEMPECK,
and DAVID B. WELLS,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2021-0560-PAF

## MEMORANDUM OPINION

Date Submitted: April 11, 2022
Date Decided: July 29, 2022

Gregory V. Varallo, Andrew E. Blumberg, Daniel E. Meyer, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Mark Lebovitch, Reuben Gottlieb, Jeroen van Kwawegen, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Jeremy Friedman, David Tejtel, Julie Palley, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York; *Attorneys for Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Miami*.

William M. Lafferty, Ryan D. Stottmann, Sabrina Hendershot, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Attorneys for Defendants Lise J. Buyer, Gokul Rajaram, and David B. Wells*.

Peter J. Walsh, Jr., Jacqueline A. Rogers, Abraham C. Schneider, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Matthew Rawlinson, LATHAM & WATKINS LLP, Menlo Park, California; Colleen Smith, LATHAM & WATKINS LLP, San Diego, California; Kristin Murphy, LATHAM & WATKINS LLP, Costa Mesa, California; *Attorneys for Defendants The Trade Desk, Inc., Kathryn E. Falberg, Thomas Falk, Blake Grayson, Eric B. Paley, David R. Pickles, and Brian J. Stempeck.*

Brad D. Sorrels, Shannon E. German, Benjamin M. Potts, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; David J. Berger, Steven M. Guggenheim, WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California; S. Toni Wormald, WILSON SONSINI GOODRICH & ROSATI, P.C., San Francisco, California; *Attorneys for Defendant Jeff Green.*

**FIORAVANTI, Vice Chancellor**

This case involves a stockholder challenge to an amendment to the certificate of incorporation of The Trade Desk, Inc. ("TTD" or the "Company") that extended the duration of its dual-class stock structure. In effect, the amendment prolonged voting control held by TTD's co-founder and Chief Executive Officer, Jeffrey Green, who owns 98% of the Company's high-vote Class B common stock. The plaintiff alleges that Green, the Company's board of directors, and certain officers breached their fiduciary duties in approving and obtaining stockholder votes for the amendment.

The defendants have moved to dismiss the complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. There is no dispute that the amendment was an interested transaction involving a controlling stockholder, which is presumptively subject to review under the exacting entire fairness standard. The defendants' primary argument in support of their motions is that the transaction complied with the framework set forth in *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) ("*MFW*"), thus subjecting the transaction to business judgment review rather than the entire fairness standard. Plaintiff argues that the defendants have not satisfied two of the six elements of the *MFW* framework. For the reasons explained below, the court concludes that the defendants have satisfied *MFW*. Thus, the transaction is subject to review under the business judgment standard, and the Complaint must be dismissed.

## I. BACKGROUND

The facts recited in this Memorandum Opinion are drawn from the Verified Class Action Complaint (the "Complaint") and documents integral thereto or otherwise subject to judicial notice.

### A. The Parties

Plaintiff City Pension Fund for Firefighters and Police Officers in The City of Miami ("City Pension Fund" or "Plaintiff") alleges that it has held Class A stock of TTD at all relevant times.[1]

Defendant TTD is a Delaware Corporation headquartered in Ventura, California.[2] TTD is a technology company that markets "a software platform to provide data-driven digital advertising campaigns."[3] Defendant Jeff Green co-founded the Company and has served as its President, Chief Executive Officer ("CEO"), and as a director of the Company since 2009.[4] Green has also been chairman of the Company's board of directors (the "Board") at all relevant times.[5]

---

[1] Dkt. 1 ("Compl.") ¶ 23.

[2] *Id.* ¶ 24.

[3] *Id.* ¶ 38.

[4] *Id.* ¶ 25.

[5] *Id.*; The Trade Desk, Inc., Schedule 14A (Apr. 13, 2021) (the "2021 Proxy") at 9. Documents filed with the United States Securities and Exchange Commission ("SEC") that are cited in this Memorandum Opinion are properly within the court's view as: (i) documents incorporated by reference to Plaintiff's Complaint; and (ii) public filings, to the

2

Defendant David R. Pickles is the other co-founder of TTD.[6] Pickles serves as TTD's Chief Technology Officer.[7] Defendant Blake Grayson has served as the Company's Chief Financial Officer ("CFO") since 2019.[8] Together, Green, Pickles, and Grayson constitute the "Officer Defendants."

When it approved the challenged certificate amendment, the TTD board of directors consisted of Green and seven outside directors: Lise J. Buyer, Gokul Rajaram, Kathryn E. Falberg, David B. Wells, Thomas Falk, Eric B. Paley, and Brian J. Stempeck (collectively the "Director Defendants").[9] Buyer, Rajaram, and Wells served on a special committee of the TTD board that negotiated the certificate amendment with Green and recommended that the Board approve it.[10]

The named defendants are collectively referred to as the "Defendants."

## B. The Company's Stock Structure

TTD has two classes of common stock. The Company's Class A common stock trades publicly on the NASDAQ Global Market under the ticker symbol

---

extent they address publicly available facts not subject to reasonable dispute. *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169–70 (Del. 2006).

[6] Compl. ¶ 10.

[7] *Id.* ¶ 26. Pickles joined the Company's Board in February 2021. *Id.*

[8] *Id.* ¶¶ 8, 27.

[9] *Id.* ¶¶ 25–26, 28–34.

[10] *Id.* ¶ 67; The Trade Desk, Inc., Schedule 14A (Oct. 27, 2020) (the "2020 Special Proxy") at "LETTER FROM THE SPECIAL COMMITTEE."

"TTD" and entitles its holder to one vote per share.[11]  The Company's Class B common stock, which is not publicly traded, is entitled to ten votes per share.[12]  This dual-class common stock structure was created in conjunction with the Company's initial public offering in 2016 (the "IPO").[13]  The original Class B stockholders included Green, members of management, and certain venture capital investors that had supported the Company's growth as a private entity.[14]  Of the 33.4 million Class B shares originally issued, Green received approximately 8.9 million.[15]  Since the IPO, the Class B stockholders have controlled the Company:

> Because of the ten-to-one voting ratio between our Class B and Class A common stock, the holders of our Class B common stock collectively continue to control a majority of the combined voting power of our common stock and therefore are able to control all matters submitted to our stockholders for approval . . . .[16]

By March 2020, the number of Class B shares outstanding had declined to approximately 5.2 million, with Green owning 97.6% of them.[17]  When added to the Class A shares that he beneficially owned, Green at that time controlled

---

[11] *Id.* ¶ 39; The Trade Desk, Inc., Form 10-K (Feb. 28, 2020) at 31.

[12] Compl. ¶ 39.

[13] 2020 Special Proxy at 12–13.

[14] *Id.*

[15] *Id.*

[16] The Trade Desk, Inc., Form 10-K (Feb. 28, 2020) at 31.

[17] The Trade Desk, Inc., Schedule 14A (Apr. 14, 2020) (the "2020 Annual Proxy") at 49 (reflecting Green's ownership of 5,071,141 Class B shares).

approximately 55% of the combined voting power of the outstanding Class A and Class B common stock.[18]

The Company's amended and restated certificate of incorporation (the "Certificate") restricts the ownership of Class B common stock to its original owners and "Permitted Transferee[s]" as defined in the Certificate.[19] If a Class B share is transferred to someone other than a Permitted Transferee, it is automatically converted into Class A common stock on a 1-for-1 basis.[20]

The Certificate also provides for the elimination of the Class B Stock once "the number of outstanding shares of Class B Common Stock represent less than ten percent (10%) of the aggregate number of shares of the then outstanding Class A Common Stock and Class B Common Stock" (the "Dilution Trigger").[21] Once the Dilution Trigger is tripped, each share of Class B common stock is automatically converted into Class A common stock on a 1-for-1 basis, and the Class B stock is canceled.[22]

---

[18] *Id.*

[19] Dkt. 63, Ex. 3 (the "TTD Certificate"), Art. IV(C)(3)(b) (the "Transfer Restriction Provision").

[20] *Id.*

[21] TTD Certificate Art. V.

[22] TTD Certificate Art. IV(C)(3)(c).

## C. Green Learns of the Approaching Dilution Trigger in May 2020

As of March 31, 2020, the Class B common stock constituted 11.2% of the Company's total outstanding Class A and Class B common stock.[23] The number of Class B common shares was continuing to decline, as Green sold shares pursuant to a Rule 10b5-1 trading plan.[24] In late May 2020, Green learned that the Dilution Trigger was looming large.[25] To avoid this control-stripping event, Green contacted Company officers, his personal financial professionals, and the other holders of Class B stock for help.[26] On May 23, 2020, Green discussed the possible elimination of the Dilution Trigger with the Company's Vice President, Investor Relations, Chris Toth.[27] In a follow up email, Toth noted that: "We may have more leverage than we think. Externally no one knows you want to sell shares. Currently our [Certificate] state[s] there is NO timeframe to sunset shares. Therefore it is

---

[23] 2020 Annual Proxy at 2 ("On the [March 31, 2020] record date, there were 40,864,997 shares of our Class A common stock outstanding and 5,169,630 shares of our Class B common stock outstanding.").

[24] Rule 10b5-1 of the Securities Exchange Act of 1934 "permits insiders to implement written, pre-arranged stock trading plans when they are not in possession of material non-public information. Generally speaking, 10b5-1 plans offer a safe harbor for corporate insiders to sell stock by ceding trading authority to third parties with exclusive discretion to execute trades under certain pre-determined parameters." *Laborers Dist. Council Constr. Indus. Pension Fund v. Bensoussan*, 2016 WL 3407708, at *2 (Del. Ch. June 14, 2016) (footnote omitted), *aff'd*, 155 A.3d 1283 (Del. 2017).

[25] Compl. ¶¶ 46, 56–58.

[26] *Id.* ¶¶ 47–59, 65.

[27] *Id.* ¶ 47.

indefinite."[28]    Toth outlined steps to propose a Certificate amendment and highlighted the importance of procuring support of proxy advisory firms ISS and Glass Lewis.[29]

The next day, on May 24, 2020, Green sent an email to his personal banker and the Company's CFO, Grayson, directing them to cancel his ongoing 10b5-1 stock sale plan "as soon as possible."[30] Green also had Julie Carolan, the Company's Financial Reporting Specialist, ask Green's bankers if there was any way to settle a portion of a conversion and sale of Class B stock placed the prior week with Class A stock instead.[31]

On May 26, 2020, Grayson updated Green as to the expected timeline of the Dilution Trigger:  "[I]f you AND Dave P[ickles] don't sell any more Class B shares, you very likely are in the clear until at least 9/30 of this year before Class B crosses below 10% of total shares."[32]  Grayson further suggested that Green encourage Pickles not to convert Class B stock "over the next couple months until any structure

---

[28] Compl. ¶ 49 (emphasis omitted); *see also* Dkt. 64, Ex. 20 (document incorporated by reference into the Complaint).

[29] Compl. ¶¶ 48, 51; Dkt. 64, Ex. 20.

[30] Compl. ¶ 54.

[31] *Id.* ¶ 55.

[32] *Id.* ¶ 56.  The court notes that the operative complaint purports to quote documents that Plaintiff has not attached as exhibits for the court's review.  Such quotations to documents not within the court's purview will be accepted as true for purposes of resolving these motions only.

7

adjustments are discussed with the board."[33] That same day, Carolan asked Green to confirm that he was willing to settle a portion of the prior week's trade with Class A stock.[34] As outlined in her email to Green, settling the trade with Class A common stock instead of Class B common stock would have tax implications, but would create a "larger cushion" to maintain the dual-class structure without tripping the Dilution Trigger.[35] Green responded: "I hate to forego 39,000,000 of long term capital gains, but I will if the [high] vote [share structure] lasts less than 6 months with current run rates."[36]

On May 27, 2020, Green emailed Wells asking for time to talk: "Can we get 30 mins tomorrow? Something has come up that is quite urgent and important and I'd love to get 30 mins to share and get your feedback."[37] Based on this email, Plaintiff finds it "reasonably inferable" that this meeting occurred and "that they

---

[33] *Id.* ¶ 56–57.

[34] *Id.* ¶ 59.

[35] *Id.*

[36] *Id.* ¶ 60. Plaintiff insinuates that Green was willing to pay $39 million in capital gains tax. *Id.* ¶¶ 11, 61. Based on the trading price of TTD Class A stock at that time, it is apparent that Green was willing to forgo long term capital gains treatment as to the approximate $39 million in sale proceeds realized from his settling the trade with 129,119 shares of Class A stock not that he would be liable for $39 million in capital gains tax. *Id.* ¶ 59.

[37] Dkt. 64, Ex. 21; Compl. ¶ 62.

discussed Green's competing desires for liquidity and continued control over Trade Desk."[38]

On May 29, 2020, Green sent an email to the Board calling a special meeting to discuss the Dilution Trigger.[39] Green's email stated, "[s]ince we recently learned that the dual class sunset provision will take effect much sooner than we thought, we need to have a board meeting to discuss what to do next."[40] Green's email proposed agenda items to discuss the impact of the dual-class structure to date, the threat to the business without this structure, identifying available options for changing the Dilution Trigger, and the applicable legal process for doing so.[41] In response to a private email from Paley, Green stated that he believed the Dilution Trigger would not be triggered until March 2021.[42]

On June 2, 2020, Green sent an email to Pickles asking him to refrain from selling Class B stock: "I think we discussed this, but please don't sell any b shares before we chat. We've got a limited runway to preserve our dual-class status."[43]

---

[38] Compl. ¶ 63.

[39] *Id.* ¶¶ 62–63.

[40] *Id.* ¶ 63.

[41] *Id.*

[42] *Id.* ¶ 64.

[43] *Id.* ¶¶ 64–65.

### D. The Special Committee Process

On June 3, 2020, the Board met to discuss the Company's dual-class structure and, specifically, the Dilution Trigger.[44] At that meeting, the Board formed a special committee comprising Buyer, Rajaram, and Wells (the "Special Committee") and empowered them to evaluate a potential Certificate amendment to extend the Company's dual-class capitalization structure.[45]

After its formation, the Special Committee selected Buyer as its chair and retained Morris Nichols Arsht & Tunnell LLP ("MNAT") as its counsel.[46] MNAT then reviewed the independence of the Special Committee members.[47] In late June 2020, the Special Committee interviewed three potential financial advisors, Perella Weinberg Partners ("PWP"), Moelis, and Centerview Partners ("Centerview").[48] In

---

[44] *Id.* ¶ 66.

[45] *Id.* ¶ 67; 2020 Special Proxy at 14 ("At the June 3, 2020 meeting, our board of directors . . . delegated to the Committee the full power and authority of our board of directors to, among other things, (i) review and evaluate the advisability of the Potential Action, (ii) identify, review and evaluate alternatives to the Potential Action, (iii) recommend, reject or seek to modify the terms of the Potential Action, (iv) if the Committee considered it advisable or appropriate, negotiate the structure, form, terms and conditions of the Potential Action and the form, terms and conditions of any definitive agreements or any amendments to the Company's governing documents, (v) obtain any necessary or desirable advice, assistance and opinions from financial advisors or other advisors, consultants and agents selected by the Committee, (vi) recommend to the full board of directors what action, if any, should be taken by the Company with respect to the Potential Action, and (vii) appoint one of its members as Chair of the Committee.").

[46] Compl. ¶ 82; 2020 Special Proxy at 15.

[47] 2020 Special Proxy at 15.

[48] Compl. ¶ 68.

10

its presentation to the Special Committee, PWP expressed concerns over the feasibility and governance implications of a full recapitalization, instead favoring an amendment to the Dilution Trigger in return for governance concessions.[49] Centerview's presentation highlighted the current market trend away from dual-class stock structures and summarized the "lessons learned" from precedent "Founder-led" recapitalizations.[50] The Special Committee then formally retained Centerview as its financial advisor.[51]

On July 2, 2020, the Special Committee held a meeting with four MNAT attorneys and five Centerview representatives in attendance.[52] The Special Committee discussed its process and the potential timing of a stockholder meeting with respect to any negotiated proposal and "expressed an initial preference for a special meeting to be held in the fourth quarter of 2020."[53] Additionally, "Centerview expressed a desire to . . . gather information concerning the Company's stockholder base and the Company's estimates of when the number of outstanding shares of Class B Common Stock will fall below 10% of the aggregate number of

---

[49] *Id.* ¶ 69.

[50] *Id.* ¶¶ 73–75.

[51] *Id.* ¶ 77.

[52] *Id.* ¶ 80; Dkt. 64, Ex. 31.

[53] Compl. ¶ 80; Dkt. 64, Ex. 31.

outstanding shares of . . . Common Stock."[54]  The Special Committee suggested that Centerview contact Toth and Carolan regarding these inquiries.[55]

Centerview's discussion materials for the July 2, 2020 meeting included alternatives available as consideration for a certificate amendment, including each alternative's relative value to stockholders.[56]  Centerview reported that control-extension proposals typically place a higher emphasis on economic considerations and that governance measures alone may be insufficient consideration for minority stockholders.[57]

At a July 23, 2020 Special Committee meeting, Centerview discussed the Company's estimation that the Dilution Trigger could be tripped "as early as the second quarter of 2021" and the "assumptions underlying such estimate."[58]  The Special Committee then authorized MNAT to inform Green's counsel, Wilson Sonsini Goodrich & Rosati, P.C. ("Wilson Sonsini"), that the Special Committee was now willing "to consider a proposal from Mr. Green regarding a potential extension of the Company's dual-class capitalization structure."[59]

---

[54] Compl. ¶ 80.

[55] *Id.*; Dkt. 64, Ex. 33.

[56] Compl. ¶ 78.  The slide did not place a dollar value on any of the alternatives.

[57] *Id.*

[58] *Id.* ¶ 81.

[59] *Id.* ¶ 82.

On July 24, 2020, Wilson Sonsini confirmed Green's interest in presenting an *MFW*-compliant offer to the Special Committee.[60]  MNAT summarized this response in an email to the committee, which stated, in part:

> [Green's Counsel] did say that he and his client recognize the need for there to be a "business rationale" for the extension (and Jeff has one that he will offer up as part of the proposal) and the potential need to address other "governance issues" as part of a proposal. He said his client is very willing to work with the Committee and will be "flexible". He said the proposal will [be] made under the MFW structure.[61]

On July 30, 2020, Wilson Sonsini informed MNAT that Green would deliver a formal proposal, featuring a "rationale for the business case," by the end of the following week.[62]  Plaintiff interprets these two responses as admissions that there was no business rationale for pursuing the transaction and the entire Special Committee process was therefore "just a ruse."[63]

On August 3, 2020, Green transmitted his proposal to the Special Committee (the "Initial Green Proposal").[64]  It contained three key provisions.[65]  First, in exchange for removing the Dilution Trigger, Green proposed that outstanding shares of Class B Common would automatically convert into Class A Common Stock upon

---

[60] *Id.* ¶ 83.

[61] Dkt. 64, Ex. 34; Compl. ¶ 83.

[62] Compl. ¶ 84.

[63] *Id.* ¶ 83.

[64] *Id.* ¶ 85.

[65] *Id.*

13

the occurrence of one of the following conditions: (i) the seven-year anniversary of the adoption of the Certificate amendment (the "Sunset Provision"); (ii) the discretion of the Company's Board, if Green was removed for cause from his positions as CEO, President, or director of the Company; or (iii) a date specified by the holders of at least 66-2/3% of the outstanding Class B common stock.[66] Second, stockholders would be provided with a right to act by written consent at duly-called annual or special meetings, so long as Green and/or his affiliates hold more than 50% of the Company's voting power.[67] Third, stockholders holding at least 10% of the Company's voting power during the immediately preceding one-year period would be provided with a right to call special meetings.[68]

The Initial Green Proposal included a letter explaining the value to the Company of Green retaining control through the extension of the dual-class common stock structure:

> [Green] believes that the continuation of the Company's governance structure—which will allow the Company to continue to be guided by the same vision and long-term perspective that have made the Company so successful, without distraction—is firmly in the best interests of the Company and all of its stockholders. Indeed, Mr. Green believes that the same principles that caused the Company to adopt its current governance structure in connection with its recent initial public offering apply with equal, if not greater, force and importance now. This is

---

[66] *Id.* at 33; *see also* 2020 Special Proxy at 17.

[67] Compl. at 33; *see also* 2020 Special Proxy at 17.

[68] Compl. at 33; *see also* 2020 Special Proxy at 17.

particularly true given that the Company, while very strong, faces new and unexpected challenges, as all companies do at this time. These challenges, as you know, include navigating unprecedented market uncertainty and volatility that are completely untethered to the Company's performance. In addition, management and the Board are faced with the task of steering the Company and its employees through a global pandemic, all while managing a complex but extremely valuable business.[69]

On August 4, 2020, the Special Committee met to discuss the Initial Green Proposal.[70] The substantive portion of the meeting minutes consist of three sentences and lack any detail as to the Special Committee's discussion with its advisors.[71] The minutes conclude:

> The Committee expressed its belief that a structure under which Mr. Green maintained voting control for at least seven to ten years post initial public offering is in the best interests of all of the Company's stockholders based on a number of different considerations, including the value associated with Mr. Green's leadership and vision for the Company.[72]

Centerview's materials for this meeting estimated that outstanding Class B shares would equal less than 10% of the Company's aggregate outstanding shares by the second quarter of 2021, thereby tripping the Dilution Trigger.[73]

---

[69] Compl. ¶ 86; 2020 Special Proxy at Appendix D-1.

[70] Compl. ¶ 88.

[71] Dkt. 64, Ex. 36 at TTD0000261.

[72] Compl. ¶ 89; Dkt. 64, Ex. 36 at TTD0000261.

[73] Compl. ¶ 89; Dkt. 64, Ex. 37 at TTD0000376.

The Special Committee met again with its advisors on August 7 and 11 to discuss the Initial Green Proposal and a potential counterproposal.[74] At the August 11 meeting the committee also considered a potential timeline for a special meeting of stockholders to vote on a possible transaction.[75]

On August 14, 2020, the Special Committee approved a counterproposal (the "Counterproposal") to the Initial Green Proposal with seven substantive modifications to Green's terms.[76] First, the Counterproposal shortened the Class B Sunset Provision date by two years, so all outstanding shares of Class B common stock would automatically convert to Class A common stock five years (instead of seven years) after the adoption of the Sunset Provision. Second, the Counterproposal removed the "for cause" limitation and the references to Green's directorship so that Green's removal as CEO or President, either with or without cause, would automatically convert the Class B stock into Class A stock. Third, similar to the original Dilution Trigger, the Counterproposal provided that the outstanding Class B common stock would automatically convert once it equaled a specific percentage (to be negotiated) of the Company's aggregate outstanding stock. Fourth, the Counterproposal clarified that for shares to be counted towards the majority

---

[74] Compl. ¶¶ 90–91.

[75] *Id.* ¶ 91.

[76] *Id.* ¶ 92.

ownership requirement within the written consent clause those shares must be owned by Green or his controlled affiliates. Fifth, the Counterproposal modified the special meeting call right to be vested in stockholders holding 20% of the Company's outstanding common stock (instead of a specific percentage of "voting power"). Sixth, the Counterproposal gave holders of Class A common stock the right to elect directors (with the number to be negotiated). Seventh, the Counterproposal provided that the Company's independent directors would elect a lead independent director.

Green ultimately accepted the majority of the terms set in the Special Committee's Counterproposal. In his August 20, 2020 response, Green pushed back on two of them.[77] Green rejected the adoption of a new dilution trigger based on the ratio of Class B stock to the total number of outstanding shares of common stock.[78] Additionally, Green specified that the holders of Class A common stock be permitted to elect 1 director if the board consists of nine or fewer directors, and 2 directors if the board consists of ten or more directors.[79] The Special Committee continued to negotiate with Green over the following few days.[80] The Special Committee relented on its proposal for a new dilution trigger based on share percentage, and

---

[77] *Id.* ¶ 95; Dkt. 65, Ex. 45 at TTD0000516.

[78] Compl. ¶ 95.

[79] *Id.*

[80] *Id.*

17

Green conceded to providing the Class A stockholders with the right to elect 1 director if the board is eight or fewer directors, and 2 directors if the board is nine or more directors.[81]   On August 27, 2020, Green and the Special Committee memorialized their agreement-in-principle in a term sheet (the "Term Sheet").[82]   The following chart illustrates the evolution from initial proposal to Term Sheet: [83]

## Project Lumen | Summary of Proposed Amendments

| Date: | August 3 | August 14 | August 20 | August 21 | August 25 | August 27 |
| Party: | Jeff Green/WSGR | Committee/MNAT | Jeff Green/WSGR[(1)] | Committee/MNAT | Jeff Green/WSGR[(1)] | Current |
|---|---|---|---|---|---|---|
| Final Conversion of Class B | 7-year anniversary of adoption<br><br>Jeff Green is not CEO, not President and not a director (and if resulting from a removal, the removal was for cause) | 5-year anniversary of adoption<br><br>Jeff Green is not CEO and not President<br><br>Dilution trigger (percentage to be agreed upon) | 5-year anniversary of adoption<br><br>Jeff Green is not CEO and not President | ⇒ | 5-year anniversary of adoption<br><br>Jeff Green is not CEO, not President and not chairman | 5-year anniversary of adoption<br><br>Jeff Green is not CEO, not President and not chairman |
| Class A Directors | — | Class A Stockholders entitled to elect a number/percentage of directors to be agreed upon | 1 (if the total number of directors is nine or fewer)<br><br>2 (if the total number of directors is ten or greater) | 1 (if the total number of directors is eight or fewer)<br><br>2 (if the total number of directors is nine or greater) | ⇒ | 1 (if the total number of directors is eight or fewer)[(2)]<br><br>2 (if the total number of directors is nine or greater)[(2)] |
| Lead Independent Director | — | Independent directors shall elect a lead director | ⇒ | ⇒ | ⇒ | Independent directors shall elect a lead director |
| Special Meetings of Stockholders | 10% of voting power; 1 year holding requirement | 20% of shares of common stock; 1 year holding requirement | ⇒ | ⇒ | ⇒ | 20% of shares of common stock; 1 year holding requirement |
| Stockholder Action by Written Consent | Permitted after Jeff Green and affiliates hold 50% or less of voting power | Permitted after Jeff Green and his controlled affiliates hold 50% or less of voting power | ⇒ | ⇒ | ⇒ | Permitted after Jeff Green and his controlled affiliates hold 50% or less of voting power |
| Enhanced ESG Disclosure | Additional governance practices to be agreed upon (including ESG) | ⇒ | ⇒ | ⇒ | ⇒ | Additional governance practices to be agreed upon (including ESG) |

MORRIS NICHOLS ARSHT & TUNNELL
CENTER|VIEW PARTNERS     6

(1)    Verbal counterproposals communicated to MNAT.
(2)    Class A Director election rights terminate upon final conversion of Class B Common stock.

---

[81] *Id.*

[82] Compl. ¶ 94; 2020 Special Proxy at 18.

[83] Compl. at 41; Dkt. 65, Ex. 45 at TTD0000516.

The full Board, including Green, met on September 3, 2020, with MNAT and Centerview in attendance, to discuss the Special Committee's negotiations, the proposed Term Sheet, and next steps.[84] The advisors warned that the deal "may be viewed as novel" and "attract attention and scrutiny from stockholders and the broader market."[85] During this meeting, the Board was shown Company projections indicating that the Dilution Trigger was expected to trip in the second quarter of 2021.[86]

On October 16, 2020, the Board voted to approve the amendment to the Certificate and the related terms (together, the "Dilution Trigger Amendment").[87] Green, Stempeck, and Falberg abstained from the Board vote, due to their ownership of Class B stock.[88] Following the vote, the Board began its campaign in support of the Dilution Trigger Amendment.[89] As one of the first steps of the campaign, the board distributed a letter to stockholders stating that the "proposals enable the board to end the dual-class structure at an earlier date (in certain circumstances)."[90]

---

[84] Compl. ¶ 97.

[85] *Id.*

[86] *Id.* ¶ 99.

[87] *Id.* ¶ 100.

[88] *Id.*

[89] *Id.* ¶ 102.

[90] *Id.*

## E. The Stockholder Vote

On October 27, 2020, the Company filed with the SEC a notice of special meeting of stockholders for December 7, 2020 (the "Special Meeting") and a Definitive Proxy Statement (the "2020 Special Proxy") to solicit stockholder votes in favor of the proposed transaction.[91]

When the date of the Special Meeting arrived on December 7, 2020 there was insufficient stockholder support to approve the Dilution Trigger Amendment.[92]  As a result, the Company adjourned the Special Meeting to enable proponents additional time to garner more votes in favor of the transaction.[93]  On December 22, 2020, the Company reconvened the Special Meeting, where the Dilution Trigger Amendment was approved, with 52% of the unaffiliated shares voting in favor.[94]

Once the Dilution Trigger Amendment had been approved, Green resumed disposing of Class B shares.  Between December 24, 2020, and April 19, 2021, he converted 544,139 Class B shares into Class A shares and sold them for aggregate proceeds of $435,481,252.[95]

---

[91] *Id.* ¶ 104.

[92] *Id.* ¶ 115.

[93] *Id.*

[94] *Id.* ¶ 117.

[95] *Id.* ¶ 119.

### F. The Proposed Equity Award

On December 3, 2020, a few days before the Special Meeting, TTD's Compensation Committee, which includes Wells and Rajaram, considered a stock option grant to Green in his capacity as TTD's CEO.[96] A presentation from the committee's compensation advisor, Compensia, outlined potential grant options including an award amounting to 5% of the Company's equity.[97] Plaintiff complains that stockholders were not aware at this time of these discussions regarding this possible award.[98] Almost a year later, on October 8, 2021, the Compensation Committee recommended and the Board approved a stock option grant to Green (the "2021 Grant").[99] Under the 2021 Grant terms, Green may receive options allowing him to purchase up to 19.2 million shares of Class A common stock, at an exercise price of $68.29 per share, if specified target goals are achieved and other vesting

---

[96] *Id.* ¶ 113; Dkt. 55 (the "Supp. to Compl.") ¶ 160.

[97] Compl. ¶ 114.

[98] Supp. to Compl. ¶ 161.

[99] *Id.* ¶ 166. Plaintiff does not assert any claims challenging the 2021 Grant itself. Instead, Plaintiff treats the 2021 Grant as evidence that the TTD Board operates with a "controlled mindset" and that the stockholder vote on the Dilution Trigger Amendment was uninformed. *Id.* ¶¶ 161, 171, 197. The 2021 Grant is currently the subject of separate litigation in this court. *Huizenga v. Green, et al.*, C.A. No. 2022-0461-PAF; *Int'l Union of Operating Eng'rs Local 137, 137A, 137B & 137R Pension & Annuity Funds, et al. v. Green, et al.*, C.A. No. 2022-0560-PAF. This opinion does not consider the claims asserted in those actions.

conditions are satisfied.[100]  This option grant only becomes exercisable and vested in eight tranches over a ten-year term if certain stock price achievements are met.[101]

### G.    Procedural History

On June 28, 2021, Plaintiff filed its Complaint asserting breach of fiduciary duty claims against Green in his capacity as a controlling stockholder (Count I), the Officer Defendants (Count II), and the Director Defendants (Count III).[102]  Each claim is based on the respective defendants' actions "imposing the unfair Trigger Amendment on Trade Desk and the Company's public stockholders" and "failing to disclose to stockholders Green's desire to sell Trade Desk shares and the date of the anticipated sunset of the dual class capitalization structure."[103]

On August 27, 2021, Defendants moved to dismiss the Complaint pursuant to Court of Chancery Rule 12(b)(6).[104]  After the parties filed opening and answering briefs, Plaintiff sought leave to supplement the Complaint, which the court granted as unopposed.[105]  Plaintiff filed its Verified Supplement to the Complaint (the

---

[100] Supp. to Compl. ¶ 167.

[101] *Id.* ¶ 168.

[102] Dkt. 1.

[103] Compl. ¶¶ 143, 148, 154.

[104] Dkt. 17; Dkt. 28; Dkt. 38.

[105] Dkt. 53 & 54.

"Supplement") on November 29, 2021.[106]  On February 1, 2022, Defendants moved

to dismiss the Complaint, as supplemented.[107]  Following full briefing, the court held

oral argument on these motions on April 11, 2021.[108]

## II.  ANALYSIS

On a motion to dismiss under Court of Chancery Rule 12(b)(6):

(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (internal citations and

quotation marks omitted).  At this stage, the pleading standards are "minimal,"

*Central Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536

(Del. 2011), but the court need not "simply accept conclusory allegations

unsupported by specific facts, nor do we draw unreasonable inferences in the

plaintiff's favor."  *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009).

---

[106] Dkt. 55.

[107] Dkt. 61; Dkt. 62; Dkt. 63; Dkt. 68.

[108] Dkt. 91; Dkt. 95.

## A.    The Defendants' Exhibits

In preparing the Complaint,  Plaintiff utilized documents that the Company produced in response to Plaintiff's demand to inspect books and records pursuant to 8 *Del. C.* § 220.[109]  In resolving the books and records demand, the parties entered into a Confidentiality and Non-Disclosure Agreement whereby the documents would "be deemed incorporated by reference in any complaint relating to the subject matter referenced in the Demands."[110]  Plaintiff cited, but did not attach as exhibits to its Complaint and Supplement, 38 documents provided in the 220 production. Defendants responded by attaching 71 documents as exhibits to their motions to dismiss, only 13 of which are cited in the Complaint.

Notwithstanding their arrangement, the parties may not rely on private agreement to change the pleading standard at the motion to dismiss stage:

> [O]ur courts must regulate how far down the road of incorporation by reference a defendant may go when plaintiff has well-pled something as fact . . . even if another document might suggest the facts are otherwise. Section 220 documents may or may not comprise the entirety of the evidence on a particular point. Until that is tested, Defendants cannot ask the court to accept their Section 220 documents as definitive fact and thereby turn pleading stage inferences on their head. That is not, and should not be, the state of our law.

---

[109] Compl. at 3; Supp. to Compl. at 3.

[110] Dkt. 66, Ex. 63.

*In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at \*14 n.216 (Del. Ch. Oct. 1, 2019).

"The incorporation-by-reference doctrine does not enable a court to weigh evidence on a motion to dismiss. It permits a court to review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one." *Voigt v. Metcalf*, 2020 WL 614999, at \*9 (Del. Ch. Feb. 10, 2020). This doctrine therefore permits the court to consider extrinsic documents only for a limited purpose.

"Where a defendant improperly and extensively uses Section 220 Documents in support of a Chancery Rule 12(b)(6) motion to support factual inferences that run counter to those supported in the complaint, the court may either exclude the extraneous matter from its consideration or convert the Chancery Rule 12(b)(6) motion into a motion for summary judgment." *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at \*18 (Del. Ch. Jan. 27, 2021), *as corrected* (Feb. 4, 2021). Therefore, instead of converting the present motions to dismiss into motions for summary judgment, the court declines to consider any extraneous documents submitted by Defendants that are not referenced in or integral to Plaintiff's pleadings or otherwise subject to judicial notice.

## B.    The Presumptive Standard of Review

Under Delaware law, a controlling stockholder owes fiduciary duties to the Company and its minority stockholders. *eBay Domestic Hldgs, Inc. v. Newmark*, 16 A.3d 1, 26 (Del. Ch. 2010).  A stockholder owning "more than 50% of the voting power of a corporation" will be deemed a "controller" under Delaware law.  *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).  At all relevant times, Green controlled more than 50% of the voting power of TTD's outstanding voting stock.[111]  Defendants do not dispute Green's status as a controlling stockholder.

"When a transaction involving self-dealing by a controlling shareholder is challenged, the applicable standard of judicial review is entire fairness, with the defendants having the burden of persuasion." *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012).  The entire fairness standard applies to "any transaction between a controller and the controlled corporation in which the controller receives a non-ratable benefit." *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at \*11 (Del. Ch. Jan. 25, 2016).  This is because Delaware courts are aware that a controller enjoys a "uniquely advantageous

---

[111] Compl. 3; *see also* Dkt. 63 ("Green Opening Br.") at 9 ("Green has held more than 50% of the Company's voting power since at least early 2018 . . .").

position for extracting differential benefits from the corporation at the expense of minority stockholders." *Id.* "The risk is thus created that those who pass upon the propriety of the transaction might perceive that disapproval may result in retaliation by the controlling shareholder." *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997). Therefore, the entire fairness standard applies to "ensure that all parties to the transaction have fulfilled their fiduciary duties to the corporation and all its shareholders." *Id.*

The Dilution Trigger Amendment eliminated the Dilution Trigger, extended the duration of the dual-class structure, and enabled Green to maintain voting control. Defendants do not dispute that the Dilution Trigger Amendment is a transaction that is presumptively subject to review under the entire fairness standard. *See IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at \*9 (Del. Ch. Dec. 11, 2017) (concluding that a reclassification under which the controlling stockholder ensured that it would retain voting control "well into the future" was presumptively subject to entire fairness review). Therefore, the court's analysis of the motions to dismiss begins with that presumption.[112]

---

[112] In its brief, Plaintiff argued that the Dilution Trigger Amendment implicated the voting rights of TTD stockholders and, therefore, was subject to "heightened scrutiny." Dkt. 76 ("Pl.'s Ans. Br.") at 36–37 (citing *Coster v. UIP Cos., Inc.*, 255 A.3d 952 (Del. 2021)). In *Coster*, the Delaware Supreme Court held that even though a stock sale which diluted one of two equal stockholders below 50% satisfied the entire fairness standard, it was otherwise also subject to further review to assess whether it was otherwise inequitable or taken for

27

## C. *MFW* Analysis

In the seminal case of *MFW*, the Delaware Supreme Court endorsed a framework that would alter the standard of review in a conflicted controlling stockholder transaction from entire fairness to the more lenient business judgment standard. To avoid entire fairness scrutiny through this doctrinal escape hatch, the following conditions must be met:

> (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders;
>
> (ii) the Special Committee is independent;
>
> (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively;
>
> (iv) the Special Committee meets its duty of care in negotiating a fair price;
>
> (v) the vote of the minority is informed; and
>
> (vi) there is no coercion of the minority.

*MFW*, 88 A.3d at 645 (formatting altered).

---

the primary purpose of thwarting the plaintiff's vote to elect directors. *Id.* at 953, 963 n.66. In so holding, the Court invoked the well-settled doctrines of *Schnell v. Chris-Craft Industries., Inc.*, 285 A.2d 437, 439 (Del. 1971) ("inequitable action does not become permissible simply because it is legally possible"), and *Blasius Industries., Inc. v. Atlas Corp.*, 564 A.2d 651, 661 (Del. Ch. 1988) (recognizing that if the board acts for the primary purpose of impeding stockholders' franchise rights, the board must prove a "compelling justification" for its actions). At oral argument, however, Plaintiff here acknowledged that it was not contending that the court must apply a *Schnell* analysis to the Dilution Trigger Amendment if Defendants have satisfied *MFW*. Dkt. 95 ("Hrg. Tr.") at 103–04.

If Defendants satisfy *MFW*, then the transaction will be subject to business judgment review. But if Plaintiff can plead a reasonably conceivable set of facts showing that any one of the enumerated conditions is not satisfied, then, the entire fairness standard governs. *Id.*

Although *MFW* was decided at the summary judgment stage and involved a freeze-out merger, the *MFW* framework is not limited to those scenarios. The court has applied *MFW* at the motion to dismiss stage and in transactions other than freeze-out mergers. *See*, *e.g.*, *Crane*, 2017 WL 7053964, at *12–21 (applying *MFW* to a stock reclassification on a motion to dismiss); *see also Tornetta v. Musk*, 250 A.3d 793, 800 (Del. Ch. 2019) (reasoning that the *MFW* framework could apply to review a challenge to executive compensation paid to a controlling stockholder); *In re Martha Stewart Living Omnimedia, Inc. S'holder Litig.*, 2017 WL 3568089, at *18–19 (Del. Ch. Aug. 18, 2017) (holding *MFW* framework applicable to claims alleging controlling stockholder obtained a non-ratable benefit in a sale to an unaffiliated third party); *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *8 (Del. Ch. Oct. 10, 2016) (applying *MFW* at motion to dismiss stage), *aff'd*, 164 A.3d 56 (Del. 2017); *Swomley v. Schlecht*, C.A. No. 9355-VCL at 64–79 (Del. Ch. Aug. 27, 2014) (TRANSCRIPT) (same), *aff'd,* 128 A.3d 992 (Del. 2015) (TABLE).

Plaintiff here contends that Defendants have not satisfied the elements of *MFW*; it does not contend it is otherwise inapplicable. Plaintiff alleges that

29

Defendants have failed to satisfy elements (ii) and (v) of the *MFW* framework. It argues that the Special Committee was not independent and that the stockholder vote was uninformed. If it is reasonably conceivable under the well-pleaded facts of the Complaint and Supplement that either element is not satisfied, then Defendants will be unable to benefit from the deferential business judgment standard of review. *Martha Stewart*, 2017 WL 3568089, at *1. The court next considers Plaintiff's arguments.

### 1. Special Committee's Independence

Plaintiff's challenge to the independence of the Special Committee is two-fold. First, Plaintiff impugns the independence of the Special Committee's chair and argues she undermined the independence of the committee as a whole. Second, Plaintiff insists the Special Committee lacked independence because it labored under a "controlled mindset," bending to Green's wishes.

The *MFW* framework contemplates that the Special Committee will act as an "independent negotiating agent whose work is subject to stockholder approval." *Flood v. Synutra Int'l, Inc.*, 195 A.3d 754, 767 (Del. 2018). To plead that a director is not independent "in a manner sufficient to challenge the [*MFW*] framework, a plaintiff must allege facts supporting a reasonable inference that a director is sufficiently loyal to, beholden to, or otherwise influenced by an interested party so as to undermine the director's ability to judge the matter on its merits." *Books-A-*

30

*Million*, 2016 WL 5874974, at *9; *accord In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *35 (Del. Ch. June 11, 2020).

"The pleading standard that governs under Rule 12(b)(6) is less stringent and more plaintiff friendly than the standard that governs under Rule 23.1." *Dell*, 2020 WL 3096748, at *35. The Plaintiff need not plead facts supporting its allegations of conflict with particularity; instead the question is whether the pleaded facts make it "reasonably conceivable" that the Special Committee members were not independent. *Id.*

The Special Committee consisted of three members: Buyer, Rajaram, and Wells,[113] with Buyer serving as its chairperson.[114] "Directors are presumed to be independent." *Friedman v. Dolan*, 2015 WL 4040806, at *6 (Del. Ch. June 30, 2015). Plaintiff does not meaningfully challenge the independence of either Rajaram or Wells. The Complaint notes that both Rajaram and Wells served on the Company's Compensation Committee and that, in December 2020, the Compensation Committee was considering a stock option grant to Green.[115] Plaintiff views this as "demonstrating both their controlled mindset and their entrenchment

---

[113] Compl. ¶ 67.

[114] Pl.'s Ans. Br. 43.

[115] Compl. ¶ 113.

motive."[116]  A large option award, contingent on various stock achievements and vesting conditions over a ten-year period, was eventually approved by the Compensation Committee in October 2021.[117]  As noted earlier, this grant is not being challenged in this litigation and there are no allegations that Rajaram or Wells made any fiduciary decision concerning the option grant prior to October 2021.  The Complaint lacks well-pleaded allegations creating a reasonable inference undermining their independence while serving on the Special Committee.[118]

---

[116] *Id.* ¶ 17.

[117] Supp. to Compl. ¶ 166.

[118] Beyond his role on the committees, the only other allegation specific to Wells is the May 27, 2020 email he received from Green requesting a thirty-minute conversation regarding "[s]omething . . . quite urgent and important."  Compl. ¶ 62.  This allegation leads to a reasonable inference that the conversation occurred and that it concerned the Dilution Trigger.  When the conversation occurred is unclear, but two days after sending this email, Green contacted the entire board to schedule a meeting about the Dilution Trigger.  *Id.* ¶ 63.  That meeting occurred on June 3, 2020.  *Id.* ¶ 66.  Without more, the allegation that Green had a conversation about the Dilution Trigger with Wells does not create a reasonable inference that Wells was conflicted or lacked independence from Green.  *See In re MFW S'holders Litig.*, 67 A.3d 496, 509 (Del. Ch. 2013) ("[A] plaintiff seeking to show that a director was not independent must meet a materiality standard, under which the court must conclude that the director in question's material ties to the person whose proposal or actions she is evaluating are sufficiently substantial that she cannot objectively fulfill her fiduciary duties"), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).  In *In re Rouse Properties, Inc.*, 2018 WL 1226015, at *14 (Del. Ch. Mar. 9, 2018), this court acknowledged that conversations between a controller and director regarding the director's employment post-merger may raise a reasonable doubt as to the director's independence from the controller for that transaction.  Plaintiff has not pleaded any allegations in this case making it reasonable to infer that the substance of the conversation between Wells and Green involved such innately conflicting topics.

Plaintiff's challenge to the independence of the Special Committee focuses solely on the chair—Buyer. Defendants argue that the allegations as to Buyer are meritless, but even if they had merit, the Complaint does not allege facts supporting a reasonable inference that a majority of the committee was not disinterested and independent. Therefore, according to Defendants, Plaintiff has not alleged facts to call into question the independence of the Special Committee.

### a. Compensation

Plaintiff's challenge to Buyer's independence is limited to the compensation that she derived from TTD as a consultant in 2016, when she was not a director of the Company, and her director compensation in 2019 and 2020.[119] The main area of dispute is whether Buyer's director compensation is material to her.

In 2016, Green hired Buyer as a consultant for TTD's IPO.[120] In return for her work on this project, Buyer received $175,000 and 2,500 options to acquire Class A stock.[121] As a director of the Company, she has received compensation of $535,558 in 2019 and $408,492 in 2020.[122] Plaintiff implies that this compensation

---

[119] Supp. to Compl. ¶ 196.

[120] *Id.* ¶ 195.

[121] *Id.*

[122] *Id.* ¶ 196. Plaintiff's brief notes that, in 2019, "Buyer's compensation was $535,558 in 2019 and $408,492 in 2020, *making her the Company's highest-paid director by a wide margin.*" Pl.'s Ans. Br. 41 (emphasis added). In 2019, Buyer received the highest total compensation for a non-employee director due to "an initial director equity award [granted

33

is material to Buyer, alleging that Buyer's TTD director compensation is her only source of income besides what she earns from her consulting company, whose annual revenue is allegedly $244,223.[123] The sole factual basis for this allegation is an online-reference to Dun & Bradstreet.[124] Defendants argue that the speculation of marketing companies such as Dun & Bradstreet regarding the revenue of private companies cannot satisfy Plaintiff's pleading burden. Buyer's director questionnaire, cited by both parties, notes that "[s]ince August 2006, Ms. Buyer has served as principal of Class V Group, LLC, a consulting firm that advises companies on initial public offerings and other market strategies."[125] Prior to Class V Group, LLC, Buyer served in a variety of hefty roles, including as Director of Business Optimization at Google, General Partner of a venture capital firm, and Director of Internet/New Media Research at Credit Suisse First Boston.[126] Buyer also served as director of a publicly traded online survey company from 2004 until it was acquired by Microsoft.[127]

---

to new director's] upon initial election to our board." 2020 Annual Proxy at 44–45. As shown in Plaintiff's pleadings, Buyer was the only new director join the Board that year. Compl. ¶ 28. The following year, Buyer's compensation was in line with that received by the other directors. 2021 Proxy at 46.

[123] Supp. to Compl. ¶ 196.

[124] *Id.*

[125] Dkt. 64, Ex. 13 at TTD0000185.

[126] *Id.*; Supp. to Compl. ¶ 196 (noting that Buyer retired from Google in 2005).

[127] Dkt. 64, Ex. 13 at TTD0000185.

This court is hesitant to infer materiality of compensation absent well-pleaded facts. The determination of whether a director's compensation from the Company is sufficient to raise a reason to doubt her independence is a fact intensive inquiry. *See In re MFW S'holders Litig.*, 67 A.3d at 510–13 (observing that a plaintiff must allege facts "showing that a specific director's independence is compromised by factors material to her" and that fees paid to a director are material to the director); *see also McElrath on behalf of Uber Techs., Inc. v. Kalanick*, 2019 WL 1430210, at *17 (Del. Ch. Apr. 1, 2019) ("The materiality inquiry must focus on the financial circumstances or personal affinities of the particular director in question."), a*ff'd*, 224 A.3d 982 (Del. 2020); *Freedman v. Adams*, 2012 WL 1345638, at *7 (Del. Ch. Mar. 30, 2012) (applying a materiality inquiry in the Rule 23.1 context and finding "with the facts as they are, the Plaintiff simply leaves the Court to speculate as to whether the Outside Directors' compensation so far exceeded what was customary that it was disabling. This argument fails."); *Chester Cnty. Empls.' Ret. Fund v. New Residential Inv. Corp.*, 2017 WL 4461131, at *8 (Del. Ch. Oct. 6, 2017) (declining to infer, under a Rule 23.1 analysis, that compensation was material to certain directors when plaintiff pleaded that the one was retired and the other's "employment background indicate[d] he ha[d] not accumulated great wealth.").

Even under the more plaintiff-friendly standard of the *MFW* framework, the plaintiff must still allege well-pleaded facts supporting a reasonable conceivability of compensation materiality to the specific director. As this court recently observed:

> Generally, serving as a director on the board of a Delaware corporation is not a pro bono gig; Delaware law recognizes that directors will be paid a fair and reasonable amount. For that reason, when director fees are not excessive, mere allegations of payment of director fees are insufficient to create a reasonable doubt as to the director's independence.

*Simons v. Brookfield Asset Mgmt. Inc.*, 2022 WL 223464, at *15 (Del. Ch. Jan. 21, 2022).

Each side has cited cases supporting their respective position.[128] The court need not wade into the issue here. Even assuming that Buyer's TTD compensation

---

[128] In addition to taking issue with the Dun & Bradstreet estimate, the Special Committee argues that merely pointing to one's director fees alone is not sufficient to create a reasonable inference that a director lacks independence or that it is the sole source of her income. Dkt. 62 ("SC Opening Br.") at 17 (citing *In re Kraft Heinz Co. Deriv. Litig.*, 2021 WL 6012632, at *12 n.124 (Del. Ch. Dec. 15, 2021) (noting that a director's publicly reported income does not always contextualize a director's wealth), and *Simons*, 2022 WL 223464, at *15 (noting that the fact that a director was retired and his directorship "is his sole source of current employment does not give rise to a reasonable inference that his [director] fees are material to him.")). On the other hand, Plaintiff cites cases for the proposition that the court has inferred reason to doubt the independence of directors drawing fees that were much lower than what Buyer received in the last two years. Pl.'s Ans. Br. 43 (citing *Del. Cnty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1020–21 (Del. 2015) (inferring at the pleading stage that director fees of $165,000 were material when they constituted 30% to 40% of the defendants' total annual income); *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *177 (Del. Ch. Mar. 19, 2018) (inferring at the pleading stage that director fees of $468,645 were material)); *see also Voigt*, 2020 WL 614999, at *15 & n.14 (citing cases where director fees in amounts lower than what Buyer received were inferred as material at the pleading stage, and observing that "[s]pecific information

creates a reasonable inference that her director compensation was material to her and that she was, therefore, not independent, the Plaintiff has not alleged facts that create a reason to doubt that a majority of the committee lacked independence or that Buyer so dominated the committee process that it undermined its integrity as a whole.

### b. Buyer's Effect on the Committee

As a general rule, outside the *MFW* framework, a plaintiff must plead facts supporting a reason to doubt the independence or disinterestedness of a majority of the board or a special committee. *See, e.g.*, *Beam ex rel. Martha Stewart Living Omnimedia, Inc.*, 845 A.2d 1040, 1046 n.8 (Del. 2004) (observing that in considering whether demand is excused in a derivative action, demand is futile unless there is a majority of independent directors); *Beneville v. York*, 769 A.3d 80, 85–87 (Del. Ch. 2000) (holding that demand is excused where a board is evenly divided between interested and disinterested directors). "Where . . . a plaintiff alleges only a minority of special committee members are incapable of disinterestedly and independently considering a transaction, a plaintiff must proffer at the pleading stage some factual predicate from which the court can infer the compromised director(s) somehow infected the special committee's process." *In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326, at \*15 (Del. Ch. May 25, 2021), *aff'd*

---

about the wealth of particular individuals is not generally available and is also not something that can usually be obtained using Section 220.").

*in part, rev'd in part and remanded*, 2022 WL 2815820 (Del. July 19, 2022).[129]

Although *GGP* did not involve the application of the *MFW* framework, the Plaintiff here acknowledges that it must meet this burden.[130]

Plaintiff argues that the court should infer that Buyer's lack of independence "somehow infected the special committee's process."[131] Plaintiff relies on *In re MAXXAM, Inc./Federated Development Shareholders Litigation*, 1997 WL 187317,

---

[129] For this proposition, the *GGP* opinion from this court relied on numerous cases from this court and the Delaware Supreme Court. *GGP*, 2021 WL 2102326 at *15 n.179 (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 363 (Del. 1993) ("This Court has never held that one director's colorable interest in a challenged transaction is sufficient, without more, to deprive a *board* of the protection of the business judgment rule presumption of loyalty."); *In re Alloy, Inc.*, 2011 WL 4863716, at *8–9 (Del. Ch. Oct. 13, 2011) (holding that the allegation that an allegedly conflicted corporate fiduciary "was in a *position*" to influence other members of a special committee was inadequate to support an inference that the special committee's process was tainted by undue influence); *Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002) ("Where only one director has an interest in a transaction, however, a plaintiff seeking to rebut the presumption of the business judgment rule under the duty of loyalty must show that the interested director controls or dominates the board as a whole" (quotations omitted)).

[130] Pl.'s Ans. Br. 43 (citing and partially quoting the foregoing sentence from *GGP*). In *AmTrust Financial Services, Inc. Stockholder Litigation*, 2020 WL 914563 (Del. Ch. Feb. 26, 2020), the plaintiffs contended that for *MFW* to apply all members of the special committee must have been disinterested and independent. *Id*. at *10 n.105. The *AmTrust* court did not need to reach that issue because the court concluded that a majority of the special committee had a material self-interest in the transaction. *Id*. This court's opinion in *GGP* acknowledged this seemingly open question of Delaware law, but did not need to reach it because *GGP* did not involve application of the *MFW* framework. The court does not need to reach that issue here, either, because the Plaintiff did not address in its complaint or brief whether *MFW* can apply only if every member of the special committee is independent and disinterested. Accordingly, that argument was waived. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[131] Pl.'s Opening Br. 43 (quoting *GGP*, 2021 WL 2102326, at *15).

at *1 (Del. Ch. Apr. 4, 1997), for the proposition that a non-independent chair's "dominant role" in the special committee process "accentuates the Court's concerns" regarding the independence of the committee as a whole. True enough, but *MAXXAM* does not move the needle for Plaintiff in this case. In *MAXXAM*, the chair of the special committee dominated negotiations of the challenged transaction, bore significant financial ties to the controller, and undermined the special committee process by selecting and hiring advisors before obtaining the approval of the committee. *Id.* at *6, *20. Plaintiff does not plead anything close to those allegations here.

The only well-pleaded fact concerning Buyer's individual conduct concerns the selection of Centerview as one of the Special Committee's two advisors. Plaintiff contends that "Buyer pressed the Special Committee to hire Centerview as its advisor."[132] This characterization is based on a single email with the subject line "For what it's worth," wherein Buyer informed the Special Committee: "I just received a strong recommendation on Centerview Partners (as a third option to PW and Moelis)."[133] In a follow up email, Buyer wrote, "Right on the web page, they talk about special committee advisory on this very topic."[134] None of this is

---

[132] Pl.'s Ans. Br. 43 n.14.

[133] Dkt. 64, Ex. 29.

[134] *Id.*

contained in the pleadings. The single footnote in a brief dedicated to this email does not create a reasonable inference that Buyer dominated the Special Committee or lacked independence. There is no allegation that Buyer unilaterally selected Centerview. Indeed, the only reasonable inference from the email is that she suggested Centerview as a third potential candidate to consider as a financial advisor and that the full Special Committee chose Centerview, a firm with relevant experience to the Special Committee's mission. That is what the meeting minutes reflect, and Plaintiff does not suggest otherwise. Buyer's email to her fellow committee members does not support an inference that she dominated the Committee or steered it in a direction under circumstances that undermined its independence.[135]

Plaintiff has not pleaded sufficient facts alleging that Buyer's conduct dominated or subverted the Special Committee process so as render the entire committee defective, even if she was determined to be lacking in independence.

---

[135] The *MAXXAM* case is further distinguishable from this action because, in *MAXXAM*, the court found that "the members of the Special Committee *all* had significant financial and/or business ties with [the controller]." *Id.* at *20 (emphasis added). Therefore, in *MAXXAM*, the court had several reasons for ultimately finding the special committee's process "infected."

### c.  Controlled Mindset

In its final effort to undermine the Special Committee, Plaintiff argues that the committee "labored under a controlled mindset and knew that securing Green's control would ingratiate themselves with Green and ensure their continued directorships at the Green-controlled Company."[136]  Defendants have framed this issue as a further challenge to the committee's independence.[137]  Plaintiff insists that its challenge goes beyond the independence of the Special Committee.[138]  Regardless of how the argument is framed, it is without merit.

The "controlled mindset" principle has been applied where, "from inception, the Special Committee fell victim to a controlled mindset and allowed [the controller] to dictate the terms and structure of the [transaction]." *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 798 (Del. Ch. 2011), *aff'd sub nom. Americas Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012).  "When analyzing director independence in the presence of a controlling stockholder, 'the focus . . . is on domination of the board with regard to the transaction at issue.'" *In re Viacom Inc. S'holders Litig.*, 2020 WL 7711128, at *23 (Del. Ch. Dec. 29, 2020), *as corrected* (Dec. 30, 2020) (citation omitted).

---

[136] Compl. ¶ 112.

[137] *See* Green's Opening Br. 51; SC Opening Br. 12–22.

[138] *See* Hrg. Tr. at 68.

Plaintiff's "controlled mindset" assertion is not supported by any well-pleaded allegations that the Special Committee members were beholden to Green or that they suffered from any disabling personal interest in the Dilution Trigger Amendment. Rather, Plaintiff insists the Special Committee's lack of independence is self-evident because it decided to maintain the dual-class structure: "[N]o independent fiduciaries acting in good faith would take affirmative action to perpetuate a dual class structure when the company and minority investors have an imminent opportunity to eliminate a super-voting class of stock."[139] This *ipse dixit* does not carry the day. Merely because the committee recommended that the Board and stockholders vote to maintain the dual-class structure, albeit in modified fashion, does not render them lacking in independence. As this court has emphasized:

> A director could believe in good faith that it is generally optimal for companies to be controlled by their founders and that this governance structure is value-maximizing for the corporation and its stockholders over the long-term. Others might differ. As long as an otherwise independent and disinterested director has a rational basis for her belief, that director is entitled (indeed obligated) to make decisions in good faith based on what she subjectively believes will maximize the long-term value of the corporation for the ultimate benefit of its residual claimants.

---

[139] Compl. ¶ 2.

*United Food & Commercial Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg,* 250 A.3d 862, 895 (Del. Ch. 2020), *aff'd,* 2021 WL 4344361 (Del. Sept. 23, 2021).

Plaintiff's controlled mindset theory relies on two cases that did not involve an *MFW* analysis. Neither case is remotely applicable to the facts of this case. In *Berteau v. Glazek*, 2021 WL 2711678, at \*12 (Del. Ch. June 30, 2021), this court held that a merger between a controlling stockholder and a subsidiary was subject to entire fairness review. In holding that the complaint stated non-exculpated claims against the two special committee members of the subsidiary, the court focused on the unique facts of that case, including: (1) the committee allowed management to select its legal advisor, which had also advised the full board; (2) the committee inexplicably did not push back on the controlling stockholder after it had first agreed to a majority-of-the-minority vote, but then reneged; and (3) the special committee provided the full board, including conflicted dual-fiduciaries, an "update" on its negotiations, at a meeting that appears to have been a pressure tactic, after which price negotiations abruptly ended. *Id.* at \*22–24. *Viacom* also involved a controlling stockholder interfering with a special committee's process. 2020 WL 7711128, at \*2. In that case, the court concluded that the Viacom special committee members were conflicted because they had close personal relationships with the principals of the controller, the controller was known to be retributive and to remove directors

that disagreed with its approach, and the committee members acted with a "controlled mindset" where the committee members were hand-picked by the controller after "disloyal" members were removed. *Id.* at *21–23. In addition, the committee refused to push back on CBS's refusal to condition the deal on a majority of the minority vote, the committee members refused to obtain any minority protections, and the controller dominated the committee's negotiation strategy. *Id.* at *22–23; *see also CBS*, 2021 WL 268779, at *40 (finding it "inexplicable" that a special committee did not attempt to secure a majority-of-the-minority vote after the controller indicated it would not agree to such a condition).

Plaintiff here offers no comparable allegations impugning the TTD Special Committee members or their process. There are no allegations that Green sought to interfere with or pressure the committee. At bottom, Plaintiff's challenge to the Special Committee is grounded in Plaintiff's belief that maintaining the dual-class structure through the Dilution Trigger Amendment was a bad deal for TTD stockholders. Maybe it was. But the Delaware Supreme Court has clarified that this court's role in applying the *MFW* framework is limited to a process analysis, not second guessing the ultimate "give" and "get": "To lard on to the due care review a substantive review of the economic fairness of the deal approved by a Special Committee, as the plaintiff advocates, is to import improperly into a due care

analysis the type of scrutiny used in entire fairness review and in appraisal cases." *Synutra*, 195 A.3d at 756.

At their core, Plaintiff's allegations do not substantively challenge the Special Committee's independence. Instead, they infer wrongdoing from business judgment decisions. As our Supreme Court confirmed in *Synutra*, "Disagreeing with the special committee's strategy is not a duty of care violation." *Synutra*, 195 A.3d at 768 (citing *Swomley v. Schlecht*, 2014 WL 4470947, at *21, *aff'd*, 128 A.3d 992 (Del. 2015)) (quotation marks and brackets omitted). To state a claim against the Special Committee for a duty of care violation in negotiating the Dilution Trigger Amendment, they must plead facts showing that the Special Committee acted with "gross negligence." *Id.* They have failed to do so here. Accordingly, it is not reasonably conceivable under the well-pleaded allegations in the Complaint or Supplement that the Special Committee lacked independence or failed to satisfy its duty of care.

### 2. The Stockholder Vote

Plaintiff also alleges that the stockholder vote on the Dilution Trigger Amendment was uninformed, thus rendering *MFW* inapplicable.[140] Plaintiff insists there were six material disclosure deficiencies in the 2020 Special Proxy. They can

---

[140] Compl. ¶ 121.

be summarized as the failure to disclose: (i) Green's desire to sell Class B stock; (ii) the Company's expectations as to when the Dilution Trigger would likely be tripped; (iii) advice that Centerview provided to the Special Committee; (iv) Green's counsel's acknowledgement that a business rationale would be needed to justify any amendment to the Dilution Trigger; (v) the Special Committee's efforts to obtain stockholder support for the Dilution Trigger Amendment; and (vi) the Compensation Committee's consideration of an equity grant to Green in December 2020.[141] According to Plaintiff, each of these material omissions rendered the stockholders uninformed, depriving them of the ability adequately to assess the transaction's fairness.

The analysis here turns on the "well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote . . . Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

---

[141] *Id.* ¶¶ 122–27; Supp. to Compl. ¶ 161.

*Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)); *accord Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994).

The question of materiality is a "context-specific inquiry." *Dell*, 2020 WL 3096748, at *39 (citation omitted). "So long as the proxy statement, viewed in its entirety, sufficiently discloses and explains the matter to be voted on, the omission or inclusion of a particular fact is generally left to management's business judgment." *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *1 (Del. Ch. Dec. 18, 2009).

For the reasons stated below, the six alleged omissions, individually and collectively, did not result in an uninformed stockholder vote on the Dilution Trigger Amendment.

### a. Green's Desire to Sell Class B Shares

Plaintiff argues the stockholder vote was uninformed because the proxy did not disclose "Green's weak bargaining position."[142] According to Plaintiff, "during the spring of 2020 Green was desperate to sell a significant portion of this Trade Desk equity," but could not do so without tripping the Dilution Trigger and thus losing majority control over the Company.[143] Plaintiff contends that this information

---

[142] Pl.'s Ans. Br. 52.

[143] Compl. ¶ 122.

was material because "it reveals that the Special Committee should have had substantial negotiating leverage against Green and could have negotiated for a dramatically more stockholder-friendly Dilution Trigger Amendment and/or other concessions from Green."[144]

Plaintiff anchors this allegation to an email from Toth to Green on May 23, 2020, which was around the time that Green learned the Dilution Trigger could be tripped in a matter of months if he continued to sell Class B shares. Toth's email stated, in pertinent part: "We may have more leverage that we think. Externally no one knows you want to sell shares."[145] Plaintiff points to this email, Green's recent sale of approximately 283,000 shares the prior week, and his subsequent sale of shares after approval of the Dilution Trigger Amendment as evidence of Green's dire need for liquidity, which, if known to the Special Committee, could have led to a better deal for stockholders.[146]

Defendants contend that this allegation is conclusory and immaterial. Plaintiff alleges no facts supporting a reasonable inference that Green had a desperate need for liquidity. There are no allegations that he required cash for any immediate

---

[144] *Id.* ¶ 123.

[145] *Id.* ¶¶ 7, 49.

[146] Notably, the Plaintiff does not allege that the stockholder vote was uninformed due to the failure to disclose Green's initiation of the process to amend the TTD Certificate to remove the Dilution Trigger.

investment or looming debt. The week before Toth's email, Green had sold TTD stock for proceeds of around $80 million.[147] The stockholder vote on the Dilution Trigger Amendment was not held until six months later, and there is no allegation of Green's having pressured the Special Committee to accelerate the process or that he was in dire need for liquidity.

Green's email to Wells, seeking to discuss a "quite urgent and important" issue does not support a reasonable inference that Green had a desperate need for liquidity. Instead, it demonstrates that Green feared that he could lose control in the relatively near future due to the tripping of the Dilution Trigger, either as a result of his own continued disposition of Class B stock—which he had just ceased—the

[147] The Complaint alleges Green initially sought to convert and sell 282,906 Class B shares, but then settled the trade by converting and selling approximately 125,764 Class B shares, with the remainder consisting of preexisting Class A shares. *See* Compl. ¶¶ 55, 59. According to a Form 4 filed with the SEC on May 20, 2020, Green converted 282,906 Class B shares into Class A shares between May 18 and 20, 2020 and sold them during that period at prices between $301 and $311 per share. The Trade Desk, Inc., Statement of Changes in Beneficial Ownership (Form 4) (May 20, 2020). In an amended Form 4, Green reported that instead of converting 254,883 Class B shares on May 18, 2020, he converted only 125,764 Class B shares. The Trade Desk, Inc., Statement of Changes in Beneficial Ownership (Form 4/A) (June 12, 2020). The court takes judicial notice of these Form 4s and these stock sales. *See Hughes*, 897 A.2d at 170 ("This Court has recognized that, in acting on a Rule 12(b)(6) motion to dismiss, trial courts may consider hearsay in SEC filings to ascertain facts appropriate for judicial notice under [Delaware Rule of Evidence] 201." (internal quotations omitted)); *Parseghian v. Frequency Therapeutics, Inc.*, 2022 WL 2208899, n.45 (Del. Ch. June 21, 2022) (taking judicial notice of SEC Form 4 reflecting a director's stock holdings); *In re Primedia, Inc. S'holders Litig.*, 2013 WL 6797114, at *11 (Del. Ch. Dec. 20, 2013) (taking judicial notice of SEC Form 4s for purposes of establishing the dates of stock purchases).

Company's issuance of additional Class A stock, or the exercise of Class A options by others.

Green's desire to sell TTD stock would not have significantly altered the total mix of information available to stockholders when deciding how to vote on the Dilution Trigger Amendment. *Arnold*, 650 A.2d at 1277. The purpose of the Dilution Trigger Amendment was to maintain the existence of the high-vote Class B stock (98% owned by Green) without an automatic conversion to Class A upon the Class B falling below the 10% threshold. The obvious effect of the amendment was that Green could dispose of Class B shares without risk of causing the automatic conversion of his remaining Class B shares.[148]

The 2020 Special Proxy disclosed that the Class B stock represented only 10.7% of the total stock outstanding, *i.e.*, 0.07% above the Dilution Trigger.[149] It also disclosed that the Dilution Trigger could be reached as early as March 2021.[150] Plaintiff does not dispute that the 2020 Special Proxy disclosed that Green proposed the Dilution Trigger Amendment. The amendment would have been unnecessary if it was not likely to be triggered in the near term, either due to the conversion and

---

[148] Green also beneficially owned 138,289 shares of Class A stock. 2020 Special Proxy at 34.

[149] 2020 Special Proxy at 2 ("On the record date, there were 41,947,749 shares of our Class A common stock outstanding and 5,015,339 shares of our Class B common stock outstanding.").

[150] *Id.* at 13.

sale of Class B stock by Green and other holders of Class B, the Company's issuance of Class A stock, or the exercise of options for Class A stock held by employees and other option holders.

Plaintiff likens the failure to disclose Green's supposed desperate need for liquidity to the non-disclosure of the infamous Arledge and Chitiea report in *Weinberger v. UOP, Inc.*, 457 A.2d 701, 703 (Del. 1985). The analogy fails.

*Weinberger* involved a controlling stockholder (Signal Companies, Inc.) acquiring the remaining shares of UOP that it did not already own in a long-form cash-out merger. Signal had placed seven of the 13 directors on the UOP board. *Id.* at 704. Two of them, Charles Arledge and Andrew Chitiea, also served on the Signal board. *Id.* at 705. Arledge and Chitiea performed a study using information obtained from UOP that determined it would be in Signal's interest to acquire the remaining UOP stock for anything under $24 per share. *Id.* The Signal board decided to offer between $20–$21 per share and never disclosed the Arledge-Chitiea report. *Id.* at 707. The Delaware Supreme Court concluded that Signal's withholding of the Arledge-Chitiea report from the UOP board and its stockholders indicated a lack of fair dealing. *Id.* at 711.

Even crediting the Complaint's allegation of Green's dire liquidity need as more than speculative, it is not comparable to the Arledge-Chitiea report. The Arledge-Chitiea report was prepared by two conflicted directors using UOP

information obtained solely in their capacities as UOP directors. *Id.* at 705. Here, Green's purported need for liquidity was not based on Company information that was secretly withheld from the other directors. Instead, it was, at best, Green's subjective motivation for proposing the Dilution Trigger Amendment. *See Rabkin v. Olin Corp.*, 1990 WL 47648, at *10 (Del. Ch. Apr. 17, 1990) (rejecting analogy to *Weinberger* where the complaint failed to allege that undisclosed information contained sensitive company data as did the Arledge-Chitiea document), *aff'd*, 586 A.2d 1202 (Del. 1990) (TABLE); *see also*, *e.g.*, *Herd v. Major Realty Corp.*, 1990 WL 212307, at *10 (Del. Ch. Dec. 21, 1990) ("the general rule is that alleged motives need not be disclosed"); *In re MONY Grp., Inc. S'holder Litig.*, 853 A.2d 661, 682 (Del. Ch. 2004) (directors' "subjective motivation or opinions are not per se material, as long as the Board fully and accurately discloses the facts material to the transaction").

As Defendants aptly put it, "anyone reading the Proxy would understand both that Green desired to retain control through the Trigger Amendment and that the amendment would enable him to continue his (disclosed) historical practice of selling shares without losing that control."[151] The omission of Green's desire to sell

---

[151] Green's Opening Br. 38. Green's disposition of TTD stock is reflected in Form 4s filed with the SEC, of which the court can take judicial notice. *See Hughes*, 897 A.2d at 170.

TTD stock did not render the stockholder vote on the Dilution Trigger Amendment uninformed.

### b.    The Estimated Dilution Trigger Date

Plaintiff contends that the 2020 Special Proxy "misleadingly disclosed that 'the Dilution Trigger could occur as early as March 2021' and suggested that any crossing of the threshold was uncertain and could be delayed far longer (even by years)."[152]    The 2020 Special Proxy's disclosures on this topic were neither misleading nor false.  "[A]s a general rule, proxy materials are not required to state 'opinions or possibilities, legal theories or plaintiff's characterization of the facts.'" *MONY*, 853 A.2d at 682 (quoting *Seibert v. Harper & Row, Publ'rs, Inc.*, 1984 WL 21874, at *6 (Del. Ch. Dec. 5, 1984)).  The 2020 Special Proxy identified the current number of shares outstanding as of the record date.[153]   It also disclosed, in conjunction with an illustrative stock ownership chart, that "there ha[d] been a significant change in the ownership of [the Company's] Class B common stock in a relatively short time since [the Company's] initial public offering."[154]  It stated that the Dilution Trigger could be tripped "as early as March 2021."[155]  Most important,

---

[152] Compl. ¶ 124.

[153] 2020 Special Proxy at 2.

[154] *Id.* at 13.

[155] *Id.*

the 2020 Special Proxy explained that the Company could not definitively predict or control when the Dilution Trigger would be tripped:

> Under our current governance structure, our board of directors does not control the occurrence of the Triggering Events (as defined in Proposal One) that will result in the elimination of our dual class capital structure. The timing of the Dilution Trigger, for example, will vary widely depending on various factors. Our board of directors can influence the Dilution Trigger through issuances of Class A common stock, but the occurrence of the Triggering Events is largely outside of our board of directors' control because conversion of the Class B common stock has the most significant effect on the Dilution Trigger.[156]

The Plaintiff does not allege any inaccuracies in this disclosure.

The Dilution Trigger date was not knowable due to the factors identified in the 2020 Special Proxy. The Plaintiff does not allege material information that was withheld from the Proxy. *See Weiss v. Rockwell Int'l Corp.*, 1989 WL 80345, at *7 (Del. Ch. July 19, 1989), *aff'd*, 574 A.2d 264 (Del. 1990) (finding that defendants "were not required to add their subjective opinion as to whether that particular [stock sale] scenario (over which they had no control) would or would not occur," especially when "the possible scenario and its likely effect were in fact disclosed"); *see also Shaev v. Adkerson*, 2015 WL 5882942, at *10 (Del. Ch. Oct. 5, 2015) ("[N]ot only is Plaintiffs desired disclosure immaterial, but it might have been inappropriate to include in the proxy materials such a speculative conclusion."). The

---

[156] *Id.* at 20.

Board was not obligated to provide additional possibilities, opinions, or characterizations as to a Dilution Trigger date that it did not have. *MONY,* 853 A.2d at 682. Therefore, the Complaint does not contain any well-pleaded allegations rendering the Proxy's disclosure on the estimated Dilution Trigger date materially misleading or incomplete.

### c. The Centerview Slide

Plaintiff asserts that the 2020 Special Proxy "fail[ed] to disclose a fair summary of Centerview's advice and recommendations to the Special Committee."[157] This argument is focused on one slide of a presentation. On July 2, 2020, shortly after being retained as financial advisor to the Special Committee, Centerview provided a "Preliminary and Confidential" presentation regarding a potential amendment to the Dilution Trigger.[158] The presentation contained a slide identifying "Potential Levers," including "Goodwill," "Economic Considerations," and "Governance Incentives."[159] Economic Considerations reflected in the slide included "'Sunset Provisions'" which provided the "Least Value" and "Financial Incentive" which provided the "Most Value," "based upon precedent control

---

[157] Compl. ¶ 125.

[158] Dkt. 64, Ex. 32.

[159] *Id.* at TTD0000381.

extension."[160] Plaintiff claims that "[t]his information is *particularly material*" because the Dilution Trigger Amendment failed to provide the Company's stockholders with economic consideration.[161]

Defendants argue that they were not required to disclose all preliminary guidance that the Special Committee received from its advisors and Plaintiff cites no authority to support such an obligation. Defendants also note that this case does not involve a merger where the committee obtained and relied on a financial advisor's fairness opinion and underlying valuation analysis. *See In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002) (holding that "stockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely"). That distinction, which the Plaintiff does not address, is a meaningful one. But the court need not decide the pending motions on that basis. The court is not persuaded under the facts of this case that a single Centerview slide, containing generalized information regarding what stockholders might find more appealing in considering a proposal to extend a dual-class structure was material information.

---

[160] *Id.*

[161] Compl. ¶ 125.

56

The 2020 Special Proxy described the terms of the proposals and counterproposals between Green and the Special Committee. None of the proposals or counterproposals contained economic terms, such as Green surrendering stock or the Company making a payment to unaffiliated stockholders. Stockholders were able to assess for themselves whether the deal struck by the Special Committee was in the best interests of the stockholders and the Company. The additional disclosure that the Special Committee could have demanded economic consideration, but did not do so, would have been obvious to any reasonable stockholder reading the 2020 Special Proxy. The omission of information contained in one slide of Centerview's preliminary presentation mentioning that financial incentives provide the most value does not render the stockholder vote on the Dilution Trigger Amendment uninformed.

### d. The Business Rationale

Plaintiff next argues the 2020 Special Proxy should have disclosed that Green's counsel told the Special Committee "on multiple occasions" that Green would be providing a "business rationale" for the Dilution Trigger Amendment.[162] A rational business purpose serves as the foundation to the business judgment rule. *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985). Green's

---

[162] Compl. ¶ 126.

57

acknowledgement of the need for a business rationale to justify eliminating the Dilution Trigger is not a material fact, but an ordinary course of proper fiduciary conduct.

Plaintiff argues that Green's acknowledgement that a business rationale was needed shows that there was none and that stockholders should have been so informed.[163] That is not a reasonable inference from the facts alleged in the Complaint. As the Plaintiff alleges, proxy advisory services such as ISS generally do not support dual-class structures.[164] The communication from Green's counsel to the Special Committee's counsel merely confirmed that Green needed to make his case to the Special Committee that repealing the Dilution Trigger was justified and that the rationale for the amendment was sufficient to persuade a majority of the unaffiliated stockholders to vote for it.

The 2020 Special Proxy included Green's August 3, 2020 letter to the Special Committee explaining his rationale for the Initial Green Proposal to eliminate the Dilution Trigger.[165] The 2020 Special Proxy also disclosed the Special Committee's reasons for approving the amendment.[166] Although Plaintiff challenges the

---

[163] Compl. ¶ 126.

[164] *Id.* ¶ 73.

[165] 2020 Special Proxy at D-1.

[166] *Id.* at "LETTER FROM THE SPECIAL COMMITTEE."

legitimacy of the Special Committee's support for extending Green's ability to control the Company, Delaware law does not render the committee's position *per se* illegitimate. *See Zuckerberg*, 250 A.3d at 895 ("As long as an otherwise independent and disinterested director has a rational basis for her belief [that it is optimal for the company to be controlled by its founder], that director is entitled (indeed obligated) to make decisions in good faith based on what she subjectively believes will maximize the long-term value of the corporation for the ultimate benefit of its residual claimants.").

The TTD stockholders were fully capable of assessing the bona fides of Green's and the Special Committee's fully disclosed rationales and assessing whether the terms of the transaction were worthy of the stockholders' support. Green's counsel's recognition that a proposal to eliminate the Dilution Trigger needed a business rationale was not material in light of the disclosures taken as a whole. *See Crane*, 2017 WL 7053964, at *13 ("[D]irectors are 'not required to disclose all available information,' but only that information necessary to make the disclosure of their recommendation materially accurate and complete.").

### e. The Special Committee's Marshalling of Stockholder Support

Plaintiff contends that the 2020 Special Proxy wrongfully failed to disclose that the Special Committee "actively worked to get significant Trade Desk

stockholders" to vote "yes" on the Dilution Trigger Amendment.[167] Plaintiff infers that this marshaling of support "reveals" the Special Committee's intent to "override the will of the Company's public stockholders."[168]

This allegation lacks merit. Notably, this argument focuses on events occurring after the issuance of the 2020 Special Proxy. Thus, if the Special Committee's efforts to obtain sufficient votes needed to be disclosed, it would necessarily have required a proxy supplement.[169] To that end, the Company filed supplemental proxy materials with the SEC on December 7, 2020 explaining: "The special meeting was adjourned to allow the Company additional time to solicit votes in favor of the proposals to be acted on by stockholders at the meeting."[170] Plaintiff does not allege that the supplemental proxy materials were false or misleading. Nor does Plaintiff attempt to argue that further disclosure specifically identifying the Special Committee as among those garnering votes for the proposal would have

---

[167] Compl. ¶ 127.

[168] *Id.*

[169] The Delaware Supreme Court has summarized a fiduciary's duty to supplement its disclosure as follows: "[S]ubsequent events may have significance, and thus require disclosure, only as they relate to information originally disclosed. If subsequent events impart a new and significant slant on information already discussed, their disclosure is mandated. If the subsequent event is tentative, ill defined or adds little to material already disclosed, the duty of fresh disclosure is limited." *Kahn v. Household Acq. Corp.*, 591 A.2d 166, 171 (Del. 1991). Plaintiff does not address this standard or attempt to meet it.

[170] The Trade Desk, Inc., Schedule 14A (Dec. 7, 2020).

"significantly altered the 'total mix' of information made available" to TTD's stockholders. *Arnold*, 650 A.2d at 1277.

Plaintiff also ignores that the Board was fully within its authority to adjourn the meeting to obtain the requisite votes to approve the Dilution Trigger Amendment. The 2020 Special Proxy included a proposal for stockholder "[a]pproval of one or more adjournments of the Special Meeting, if necessary, to solicit additional proxies if there are insufficient votes at the time of the Special Meeting to approve any of the proposals to be considered at the meeting."[171] At the December 7, 2020 meeting, a majority of the stockholder votes cast approved this adjournment proposal.[172] Therefore, the Board possessed the legal authority to do so.

Delaware law does not require that directors remain neutral regarding the matters they propose for stockholder action. *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 808–09 (Del. Ch. 2007) ("As a matter of fiduciary duty, directors should not be advising stockholders to vote for transactions . . . unless the directors believe those measures are in the stockholders' best interests. And when directors believe that measures are in the stockholders' best interests, they have a fiduciary duty to

---

[171] 2020 Special Proxy at 6.

[172] *See* The Trade Desk, Inc., Form 8-K Amendment No. 1 (Dec. 10, 2020) at Item 5.07 (69,932,843 cast "for" the proposal, 7,373,591 votes cast "against," and 88,030 votes abstained).

61

pursue the implementation of those measures in an efficient fashion.").  In fact, the law provides directors with broad authority to expend company resources garnering support for proposals that they have deemed to be in the best interests of the company.  *MONY*, 853 A.2d at 675 ("Directors can spend the corporation's money on printing and distributing a proxy statement explaining their judgment as to the benefits of the merger proposal. The[y] can retain experts to solicit proxies and publicize their views. They can hire lawyers and other advisors to defend their actions in court or in front of administrative or legislative bodies.").  The Special Committee's efforts to obtain sufficient votes to approve the Dilution Trigger Amendment was not a fact that required supplemental disclosure.

### f. The Compensation Committee's Consideration of an Equity Grant to Green in December 2020

Finally, Plaintiff complains that the Company's stockholders were not informed that the Company's Compensation Committee met on December 3, 2020 to consider issuing Green a "mega [stock option] grant" (the "Contemplated Green Award").[173]  At this meeting, the Compensation Committee "considered . . . granting options to Green amounting to 5% of the Company's equity."[174]  There is no allegation that the Compensation Committee took any action at this meeting or at

---

[173] Supp. to Compl. ¶ 161.

[174] *Id.* ¶ 160.

any time prior to October 2021 concerning this potential option grant. Plaintiff admits that, at the time of filing its Complaint, the Board had not yet approved any such grant.[175] Indeed, an options grant was not awarded to Green until October 6, 2021, a full 10 months after the Compensation Committee meeting that forms the basis for this disclosure claim.[176]

Plaintiff nonetheless argues that knowledge of the contents of the Compensation Committee's December 3, 2020 meeting would have materially altered the total mix of information provided to stockholders deciding how to vote on the Dilution Trigger Amendment: "Had Trade Desk stockholders known that the Board and Compensation Committee were strongly considering the near-term bestowal of a windfall on Green, stockholders may have decided to vote against the perpetuation of control."[177]

The 2021 Special Proxy was filed with the SEC on October 27, 2021, over a month before the Compensation Committee's December 3 meeting wherein they discussed the Contemplated Green Award. Given this timing, any disclosure regarding the meeting would have necessarily been a supplement to the 2021 Special Proxy. As explained by the Delaware Supreme Court, the Board bears a duty to

---

[175] Compl. ¶ 19.

[176] Supp. to Compl. ¶ 166.

[177] *Id.* ¶ 161.

supplement its disclosure only when "subsequent events impart a new and significant slant on information already discussed." *Household*, 591 A.2d at 171.

In December 2020, the TTD stockholders were being asked to vote on the continuation of its existing governance structure, *i.e.* the dual-class stock structure, which enabled its founder to retain voting control of the Company.[178] The Contemplated Green Award was not one of the proposals presented to the stockholders for their vote in December 2020. In fact, the Contemplated Green Award was entirely speculative at the time the adjourned and reconvened stockholder meetings were held.[179] "Delaware law does not require disclosure of inherently unreliable or speculative information which would tend to confuse stockholders." *Arnold*, 650 A.2d at 1280; *accord Crane*, 2017 WL 7053964, at \*13; *see also In re Columbia Pipeline Gp., Inc.*, 2017 WL 898382, at \*5 (Del. Ch. Mar. 7, 2017) ("As a matter of Delaware law, a board does not have a fiduciary obligation to disclose preliminary discussions, much less an analysis of preliminary discussions."). Plaintiff's argument that disclosure of a potential large equity grant was required because it was being considered as an "alternative to the then-uncertain

---

[178] Compl. ¶ 86; 2020 Special Proxy at Appendix D-1.

[179] Supp. to Compl. ¶ 160 ("The Compensation Committee *considered*, as of its December 3, 2020 meeting, granting options to Green") (emphasis added); *Id.* ¶ 161 ("the Board and Compensation Committee were *strongly considering* the near-term bestowal of a windfall on Green") (emphasis added).

Trigger Amendment"[180] is equally unpersuasive. *See In re 3Com*, 2009 WL 5173804, at \*6 ("Delaware law does not require management to discuss the panoply of possible alternatives to the course of action it is proposing." (internal quotations omitted)); *accord Crane*, 2017 WL 7053964, at \*13.

Plaintiff has failed to explain how a reasonable shareholder would have considered the Compensation Committee's preliminary consideration of an option grant to its CEO on December 3, 2020 "important in deciding how to vote" on the Dilution Trigger Amendment. *Rosenblatt*, 493 A.2d at 944; *see Household*, 591 A.2d at 171 (holding supplemental disclosure not required about an agreement that was not definitive); *In re Vaxart, Inc. S'holder Litig.*, 2022 WL 1837452, at \*15–19 (Del. Ch. June 3, 2022) (holding that the company's selection to participate in a government-funded research program that was subject to further negotiation was not material information requiring supplemental disclosure).

Therefore, Plaintiff has failed to allege facts to support a reasonable inference that the failure to disclose preliminary discussions regarding the Contemplated Green Award rendered the stockholders' vote on the Dilution Trigger Amendment uninformed.

\*   \*   \*

---

[180] Pl.'s Ans. Br. 66 (emphasis omitted).

Plaintiff has failed to plead facts sufficient to challenge the application of the *MFW* framework. "Thus, the [Dilution Trigger Amendment] is subject to the business judgment rule." *Crane*, 2017 WL 7053964, at \*21. Under the version of the business judgment rule earned by proper implementation of the *MFW* framework, only a well-pleaded claim for waste may survive. *Dell*, 2020 WL 3096748, at \*14. Plaintiff has not pleaded a claim for waste and has made no effort to overcome the business judgment rule.

## III. CONCLUSION

For the foregoing reasons, the Defendants' Motions to Dismiss are GRANTED, and the Complaint is dismissed with prejudice.

**IT IS SO ORDERED.**